**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

MID-CONTINENT CASUALTY COMPANY,

          Plaintiff,

vs.                                                   Case No. 3:06-cv-518-J-32MCR

CLEAN SEAS COMPANY, INC., et al.,

          Defendants.

## **ORDER**[1]

This insurance coverage dispute is before the Court on plaintiff Mid-Continent Casualty Company's ("Mid-Continent") Motion for Summary Judgment (Doc. 60). Defendant West Marine Products, Inc. ("West Marine") filed a response in opposition (Doc. 67), and defendants Westport Marina, Inc., The Coast Distribution System, Inc., Kellogg Marine, Inc., and CC Marine Distributors, Inc. ("the Westport defendants") filed a joint response in opposition (Doc. 69). These responses were adopted by defendant Dolphonite, Inc., through its Chapter Seven Bankruptcy Estate Trustee, Gary Cruickshank[2] (Doc. 72). Numerous exhibits have been filed as well (Docs. 53, 54, 55, 56, 57, 58, 59, 65, 68, 86, 104) and the Court permitted Mid-Continent to file a reply (Doc. 106).[3] The Court heard oral argument on

---

[1]Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically. However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

[2]Dolphonite's bankruptcy resulted in a stay of approximately six months early in the case. See Docs. 10-16.

[3]West Marine's motion to strike this reply (Doc. 108) is **denied**.

December 12, 2008, the record of which is incorporated by reference, and the parties submitted supplemental filings related to recent activity in an underlying lawsuit. See Docs. 121, 123, 124, 129, 130.

**I.    Background**

Mid-Continent issued two successive (February 15, 2003 - February 15, 2004 and February 15, 2004 - February 15, 2005) commercial general liability insurance policies to defendant Clean Seas Company, a Florida manufacturer and seller of a marine anti-fouling system, also known as "bottom paint," used on recreational boats to prevent the growth of algae, barnacles, and the like. Defendant Dolphonite, Inc. was a distributor of Clean Seas bottom paint. West Marine and the Westport defendants are retailers and wholesalers of boating products and/or marinas that sold the Clean Seas products to their customers.

In November 2003, Dolphonite sued Clean Seas in Massachusetts federal court claiming that the Clean Seas bottom paint product was defective. In February 2004, West Marine sued both Dolphonite and Clean Seas in Massachusetts federal court claiming that the Clean Seas bottom paint West Marine sold its customers was defective.[4] In May 2005, the Westport defendants sued Clean Seas in the Northern District of New York claiming that the Clean Seas bottom paint the Westport defendants sold their customers was defective. Clean Seas sought coverage for these claims under its Mid-Continent insurance policies.

---

[4]The two Massachusetts actions were consolidated and tried to a jury in December, 2008. At the December 12, 2008 hearing before this Court, counsel for Mid-Continent represented that Dolphonite settled its claims against Clean Seas. Dolphonite was absent from the December 12, 2008 hearing, apparently on the basis of that settlement. As discussed further below, a verdict has since been rendered in the Massachusetts litigation, which affects some of West Marine's claims in this action.

2

Mid-Continent brought this suit seeking a declaratory judgment that, for several different reasons, its policy does not cover the claims. The Westport defendants brought a counterclaim seeking a declaration that the Mid-Continent policy covers claims brought by the Westport defendants in a Florida state court action against Clean Seas directors and shareholders, Martin Polsenski and Warren Powers. Dolphonite, through its Trustee, also brought a counterclaim and cross-claims seeking a declaration that the Mid-Continent policy covers claims brought against Dolphonite for the failure of the Clean Seas product[5] and further seeking a determination as to the appropriate division of policy proceeds among Dolphonite and its creditors.

Mid-Continent has moved for summary judgment claiming that the economic damages and repair and replacement damages asserted by West Marine and the Westport defendants in their underlying lawsuits against Clean Seas are not covered by the policy Mid-Continent issued to Clean-Seas[6] and some of these types of damages are specifically excluded under the policy terms; and that the interpretation of the "per claim" deductible asserted by

---

[5]According to Dolphonite, over $2,000,000.00 in claims have been brought against the bankruptcy estate over the failure of the Clean Seas product.

[6]For purposes of this Order, the two successive policies will be treated as one as no party has argued that there was any difference between the two that is material to the issues before this Court. Although the Westport defendants suggested that additional discovery was needed to determine the meaning of a difference between the two policies, see Doc. 69 at 2, they have apparently abandoned that idea, having failed to move to extend the discovery deadline or to respond when the Court inquired about their interest in possibly obtaining further discovery on this point. See Orders, Docs. 70, 80. While "Rule 56(f) 'allows a non-moving party to survive a summary judgment motion where additional discovery is required to defend the motion, "[t]he nonmovant may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts . . . ." Barfield v. Brierton, 883 F.2d 923, 931 (11th Cir. 1989) (citation omitted).

3

Dolphonite is erroneous. Defendants disagree with Mid-Continent's positions on these points and the Westport defendants further suggest that this matter is not ripe for decision on summary judgment.[7]

## II.     Standard of Review and Applicable Principles of Law

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "The burden of demonstrating the satisfaction of this standard lies with the movant, who must present pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that establish the absence of any genuine material, factual dispute." Branche v. Airtran Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003) (internal quotations omitted).

Although the Westport defendants suggest this motion is premature because Mid-Continent's liability cannot be determined until after the underlying cases are decided, the policy at issue includes both a duty to indemnify Clean Seas and a duty to defend it and Mid-Continent is entitled to a ruling now as to whether the underlying complaints seek damages from Clean Seas for claims which, if proven in the underlying litigation, would be covered under the policy. See Clarendon Am. Ins. Co. v. Miami River Club, Inc., 417 F.Supp.2d 1309, 1317 (S.D. Fla. 2006) ("In a declaratory judgment action, if the allegations in the complaint alleging a claim against the insured either are acts not covered by the policy or are excluded from the policy's coverage, the insurer is not obligated to defend or indemnify the

---

[7]West Marine raised ripeness as an issue in its papers as well but the rendering of the verdict in the Massachusetts action moots that point as to West Marine.

4

insured.") (citations and quotations omitted); Northland Cas. Co. v. HBE Corp., 160 F.Supp. 2d 1348, 1358 (M.D. Fla. 2001) ("Summary judgment is appropriate in declaratory judgment actions seeking a declaration of coverage when the insurer's duty, if any, rests solely on the applicability of the insurance policy, the construction and effect of which is a matter of law.") (citation omitted). Mid-Continent's motion is therefore ripe for decision.

The parties agree that Florida law governs the interpretation of the insurance policies at issue. Under Florida law, "[w]hen assessing an insurance dispute, the insured has the burden of proving that a claim against it is covered by the policy, and the insurer has the burden of proving an exclusion to coverage." Key Custom Homes, Inc. v. Mid-Continent Cas. Co., 450 F.Supp.2d 1311, 1316 (M.D. Fla. 2006) (citations omitted). Where policy language is clear and unambiguous on its face, the insurance contract must be accorded full effect as written. Id. (citations omitted). Ambiguities, on the other hand, are to be construed in favor of finding coverage and against the insurer who has drafted the policy. Id. (citations omitted).[8]

**III.     Analysis**

   A.  Property Damage

In the lawsuits brought against Clean Seas by West Marine and the Westport defendants, West Marine and the Westport defendants allege, inter alia, that they have

---

[8] The Court recognizes that Clean Seas, the insured party, has not taken an active position in this suit and that it is the defendants seeking damages from Clean Seas who are having to argue that the claims are covered by the Mid-Continent policy. The decisions below did not require the Court to determine what burden, if any, these defendants bear in terms of proving coverage.

5

incurred losses for the purchase price of the Clean Seas bottom paint, amounts paid to market, sell, ship, and store the paint, costs incurred in handling and processing customer complaints regarding the paint, which included litigation with both customers and distributors, costs for removing the paint from customers' boats, costs for repairing damage to boats caused by the defective paint, lost sales, good will, and business opportunities, all of which constitute "property damage."[9] Similarly, in its counterclaim here, Dolphonite also alleges that its damages include the amounts it paid for Clean Seas' defective paint product, amounts spent marketing and selling the Clean Seas' product, amounts to ship and store the product, costs incurred handling claims and complaints, lost sales, loss of good will, loss of business opportunities, cost incurred in enforcing Dolphonite's contract with Clean Seas, attorney's fees and professional fees, penalties on lines of credit and debt, amounts paid and lost on refused and returned product, and other incidental and consequential damages. Mid-Continent claims all of these damages are beyond the scope of coverage under the policy it issued to Clean Seas.

In pertinent part, the policy provides coverage for "property damage" that is "caused by an 'occurrence'." Doc. 1 (Complaint), at Exhibit B (Policy), Section I. Coverages, 1.

---

[9]As noted above, the underlying consolidated Massachusetts action brought by West Marine reached a verdict and Clean Seas and Dolphonite apparently settled. The parties dispute the effect of the Massachusetts verdict on the claims raised here, and, as the other underlying lawsuits have not yet been decided, Mid-Continent's motion for summary judgment, which seeks a determination as to what claims are covered under the policy it issued to Clean Seas, remains at issue and ripe for decision. Because these matters present legal issues appropriate for decision in a declaratory judgment action, and because the Westport defendants' underlying New York and Florida lawsuits are still pending, this Order does not dwell on whether a particular argument or position has been raised by a defendant who may no longer have a stake in the outcome of that specific issue.

Insuring Agreement (a) and (b)(1). As defined in the policy, "property damage" means "[p]hysical injury to tangible property, including all resulting loss of use of that property . . . or [l]oss of use of tangible property that is not physically injured." Id. at Section IV. Definitions, 17. An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id. at 13. The policy coverage is limited by numerous exclusions, including, in pertinent part:

Exclusion "k," "Damage To Your Product," which provides that the insurance does not apply to "'[p]roperty damage' to 'your product' arising out of it or any part of it;"

Exclusion "m," "Damage To Impaired Property or Property Not Physically Injured," which provides that the insurance does not apply to "'[p]roperty damage' to 'impaired property'[10] or property that has not been physically injured, arising out of . . . a defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work' . . . ." (Exclusion "m" is limited however, by an exception that provides that "[t]his exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use");

Exclusion "n," "Recall of Products, Work or Impaired Property," which provides that the insurance does not apply to "[d]amages claimed for any loss, cost or expense incurred

---

[10]"Impaired property" is defined as "tangible property, other than 'your product' or 'your work', that cannot be used or is less useful because . . . [i]t incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous; or . . . [y]ou have failed to fulfill the terms of a contract or agreement; if such property can be restored to use by . . . the repair, replacement, adjustment or removal of 'your product' or 'your work'; or . . . [y]our fulfilling the terms of the contract or agreement." Doc. 1 (Complaint), at Exhibit B (Policy), Section IV. Definitions, 8.

7

by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of . . . '[y]our product'; '[y]our work'; or '[i]mpaired property'; if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it."

Id. at Section I. Coverages, 2. Exclusions, k, m, n.

First, as a matter of law, the Court finds the claims for losses incurred for the purchase price of the Clean Seas bottom paint are specifically excluded from coverage pursuant to exclusion "k," as they are damages to the Clean Seas product itself. See generally, Aetna Cas. and Surety Co. of Amer. v. Deluxe Systems, Inc., 711 So.2d 1293, 1296-97 (Fla. 4th DCA 1998) (explaining that CGL policies cover damages caused by the product, but not damages to the product itself); Harris Spec. Chems., Inc. v. United States Fire Ins. Co., No. 3:98-cv-351-J-20B, 2000 WL 34533982, *5 (M.D. Fla. Jul. 7, 2000) ("Liability policies are not intended to provide protection against the insured's own faulty product or workmanship"). Similarly, claims for the loss of use of space to store the paint are excluded pursuant to exclusion "m" (the impaired property exclusion) because no "sudden and accidental physical injury" is alleged to have occurred as would create an exception to this exclusion. See Deluxe Systems, 711 So.2d at 1297; Commercial Union Ins. Co. v. R.H. Barto Co., 440 So.2d 383, 387-88 (Fla. 4th DCA 1983) (explaining that "sudden and accidental physical injury" exception did not apply to air conditioning system's failure which resulted in loss of use of office space and claim therefore was excluded from coverage by impaired property exclusion). See also, Harris Spec. Chems., 2000 WL 34533982, *7

(holding that "impaired property exclusion" applied to exclude coverage for cost to remove defective building sealant where removal did not harm any other part of building except occasional de minimus damage). The Court further finds that the amounts paid to market, sell, and ship the paint; lost sales, good will, and business opportunities; as well as the costs incurred in handling and processing customer complaints regarding the paint, which included litigation with both customers and distributors, and various associated fees and costs, are not "property damages" within the meaning of the policy. See generally, Key Custom Homes, 450 F.Supp.2d at 1317-18 (describing non-compensability of economic damages under identical policy language). None of the defendants has articulated a sufficient basis under Florida law for the Court to find otherwise under the unambiguous language of this insurance policy.

Rather, the crux of the property damage issues here relate to the costs for the removal of paint from customers' boats, and the costs for repairing damage to boats caused by the defective paint. In the underlying complaints, West Marine and the Westport defendants allege that the failure of the Clean Seas paint resulted in increased marine growth that damaged the hulls of boats; that the paint itself damaged the boat hulls when it was being removed; and that in some cases, especially those involving inflatables, the paint could not even be removed, rendering the boats unusable. All of these claims are allegations of property damage that, barring another basis for exclusion, would be covered under the policy. This is not an instance, therefore, where the damages are alleged to have resulted from the mere removal and replacement of a defective product (which would not be

9

covered property damage and would further be excluded under exclusion "n").[11] Rather, the allegations are that the defective paint caused damage to the hulls of many boats to which it was applied. See, e.g., Auto-Owners Ins. Co. v. Pozzi Window Co., 984 So.2d 1241, 1248 (Fla. 2008) (explaining that while removal of defective component alone is not "property damage," where a "defective component results in physical injury to *some other* tangible property," property damage is alleged to have occurred) (emphasis added). Given these allegations (which are further supported by the evidence of record), the Court finds that the underlying complaints allege covered claims. See National Union Fire Ins. Co. v. Lenox Liquors, Inc., 358 So.2d 533, 536 (Fla. 1977) (holding that in a declaratory judgment action, court looks to allegations of underlying complaint against insured to determine whether allegations fall within coverage of policy).[12]

### B. Per-Claim Deductible

The CGL policy issued to Clean Seas gave the insured an option to select a deductible amount on either a "per claim" or "per occurrence" basis. Clean Seas selected a $1,000 "per claim" deductible. In this lawsuit, Dolphonite (through its bankruptcy Trustee) has brought a counterclaim against Mid-Continent seeking declaratory judgment that the policy's per claim deductible is satisfied by the aggregate of boat owners' claims brought by each plaintiff in suits against Clean Seas, meaning that each claim by an individual boat

---

[11]See Deluxe Systems, 711 So.2d at 1296-97; Harris Spec. Chems., 2000 WL 34533982, *5.

[12]Although Mid-Continent disputes whether the result is applicable here, as it turned out, the jury in Massachusetts apparently found boats had sustained damage from the defective paint.

owner does not trigger a new deductible. Mid-Continent's position is that each application or sale of defective bottom paint creates a separate claim subject to the per claim deductible and that, since no individual boat owner's covered claim exceeded $1,000,[13] Mid-Continent has no liability for those claims. Mid-Continent therefore seeks a declaration from the Court that each end-user's covered claim triggers a $1,000 deductible and that Mid-Continent's indemnity obligations do not ripen until the $1,000 deductible is paid on each claim. Although, as noted above, Mid-Continent represented that Dolphonite (who raised this issue) settled with Clean Seas, the remaining parties agreed that the Court should decide this legal issue, which has application to the remaining claims.

The relevant policy language states that the per claim deductible applies under the property damage liability coverage "to all damages sustained by any one person [including an organization] because of 'property damage' . . . as a result of any one 'occurrence'." As noted above, an "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Doc. 1 (Complaint), at Exhibit B (Policy) Section IV. Definitions, 13. This plain language means that per claim deductibles must be paid as to those who have sustained property damage because of any one occurrence. As applied to the facts of this case, therefore, a per claim deductible must

---

[13]While the invoices submitted by many of the individual boat owners do exceed $1,000, Mid-Continent's position is that the bulk of those costs are just for removal and replacement of paint, which are not covered under the policy. Although the sample of invoices provided to the Court lends some support to this position, until it is proven in each case that the Clean Seas paint caused property damage, the invoices cannot be parsed to determine which costs are covered and which are not. The parties dispute whether the Massachusetts verdict settles the matter for some of the claims and the Court will afford them an opportunity to develop this issue.

11

be paid as to each boat owner whose boat is demonstrated (through proof in the underlying trials or otherwise) to have sustained property damage because of the application of the defective Clean Seas product.

Although there are concededly important factual distinctions, this result is supported by the only Florida case to apparently have discussed this deductible language, Kent Insurance Company v. Capitol Maintenance, Inc., 433 So.2d 1295 (Fla. 1st DCA 1983). In Kent, claims were brought by two auto insurers and a corporation against a bridge contractor who negligently sprayed paint onto dozens of cars belonging to the auto insurers' customers and onto 33 cars belonging to the corporation and another 16 cars belonging to employees of the corporation, resulting in damages to each car of less than $1,000. 433 So.2d at 1296. The two auto insurers and the corporation argued that together they had brought three claims against the contractor and that the per claim deductible due under the policy was $3,000. Id. In rejecting their argument, the appellate court held that although the "occurrence" was the "continuous or repeated exposure to the overspray painting landing on motor vehicles while the bridge was being painted," allowing the individual claims of auto owners to be aggregated into a few "superclaims" brought by their insurers and employer acting as their subrogees defeated the plain language of the per claim deductible provision. Id. at 1297. The court in Kent emphasized that the individuals whose autos were damaged each retained the right to bring a claim against the contractor and that to permit the aggregation of their claims "defeat[ed] the purpose and intent of the per claim deductible

12

provision." Id.[14]   The Court recognizes that, unlike the insurers and corporation in Kent, West Marine and the Westport defendants provided the defective product to their customers and therefore have an interest in this matter that make them much more than mere subrogees for their customers' claims. However, where it is the boat owners who have allegedly sustained the property damage, and not (as the Court has held above) West Marine or the Westport defendants, their interest is insufficient to place them in the role of claimant for purposes of the per claim deductible provision which centers on the individual who has sustained property damage.

Focusing on the role they played in supplying the paint to the boat owners, West Marine and the Westport defendants urge the Court to follow the analysis of a case where the parties had similar relationships, Essex Insurance Co. v. Chemical Formula, LLP, No. 1:cv-05-0364, 2006 WL 5720284 (M.D. Pa. Apr. 7, 2006). In Essex, a janitorial service applied a defective cleaning product to its customers' floors, resulting in property damage to the flooring for which it sued the cleaning product manufacturer. Id. at *1. In holding that only one deductible was owed on a per claim deductible policy, the Essex court reasoned that all injuries stemmed from the single occurrence of the sale of the defective product to the janitorial service and that a deductible was owed as to each party who brought a lawsuit. Id. at *8. However, this analysis fails to consider the "superclaim" concerns raised by the Kent court and further seems to render meaningless the option to retain coverage on a "per

---

[14]Only one deductible was due for the claim brought by the corporation for damages to the 33 vehicles it owned.

13

occurrence" basis, as any failed product would surely result in only one "occurrence."[15] Moreover, the policy language of the per claim deductible provision in Essex omits the emphasis on having sustained "property damage" as is contained in the Clean Seas CGL policy, which is relevant here because the Court has found West Marine and the Westport defendants have not themselves suffered such damage. See Essex, 2006 WL 5720284, at *8. The Court therefore finds the analysis in Essex to be distinguishable.

Additionally, Mid-Continent argues that its obligation to cover claims is not triggered until the deductible is paid and that it therefore does not have any obligation because no deductible has been paid. However, Mid-Continent unquestionably has a duty to defend which is activated by a timely claim for the defense of a lawsuit that appears to raise claims covered under the policy. Any issue of the payment of a deductible will await a final determination of Mid-Continent's indemnification obligations.

### C. Advertising, Common-law fraud, negligent and intentional misrepresentation claims

Although not the focus of the parties' papers, the Westport defendants additionally argue that their complaints against Clean Seas allege claims for fraud and negligent misrepresentation which are covered claims under the personal and advertising liability clause. However, these allegations do not meet the policy definition of claims covered by

---

[15]Though the contexts are somewhat different, Florida courts are more likely to find the "occurrence" is nearer to the site of actual injury. See, e.g., Koikos v. Travelers Ins. Co., 849 So.2d 263 (Fla. 2003) (holding in suit against insured for failure to provide security that "occurrence" was not insured's alleged failure to provide such security but each shooting of a customer that resulted in injury).

14

this clause;[16] moreover, such claims are specifically excluded by exclusion "g" (excluding from coverage claims "arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your 'advertisement'"). See Doc. 1 (Complaint), at Exhibit B (Policy), Section I- Coverages, Coverage B, 2. Exclusions, g. Thus, any such claims are not covered by the CGL policy.

### D. Other claims/matters remaining

Having reached these decisions as a matter of law, it is unclear what, if anything, remains to be tried in this lawsuit. For example, the Westport defendants' counterclaim seeks coverage from Mid-Continent for claims brought in a state court suit against Polsenski and Powers. Mid-Continent filed an answer (which explained it was unaware of the Polsenski/Powers suit) but did not specifically move for summary judgment on those claims (nor did the Westport defendants). The Court has therefore had no occasion to review that underlying state court complaint and takes no position as to whether the decisions here have application to the coverage issues raised by that counterclaim. Additionally, Gary Cruickshank (the Dolphonite Bankruptcy Estate Trustee) filed a counterclaim against Mid-Continent and cross-claims against the other defendants seeking a declaration as to the parties' various rights under the policy, only some of which are addressed by the above

---

[16]"Personal and advertising injury" is defined under the policy as injuries arising out of various offenses such as false arrest, detention or imprisonment, malicious prosecution, wrongful eviction, publication of slanderous or libelous statements, copyright infringements. Doc. 1 (Complaint), at Exhibit B (Policy), Section IV. Definitions, 14. None of the allegations of the underlying complaints appear to fall within this definition.

discussion.[17] No party moved for summary judgment on those claims either and Mid-Continent advises that Dolphonite has settled its claims against Clean Seas, suggesting that it is no longer interested in pursuing its claims here. The Court vacated the remaining case deadlines to conduct oral argument. With the guidance provided by this Order, and in light of the Massachusetts verdict, it seems appropriate at this juncture to direct the parties to confer to determine how best to resolve the remaining issues. The parties are reminded that the Mediator suggested they return for further assistance once the Court reached decision on summary judgment (see Mediator's interim report, Doc. 87).

Accordingly, it is hereby

**ORDERED**:

1. Mid-Continent's Motion for Summary Judgment (Doc. 60) is **granted in part** and **denied in part** as explained in the body of this Order.

2. The parties shall confer and file a notice of status no later than **May 1, 2009**, advising whether they plan to engage in settlement discussions (either on their own or with assistance from the Mediator) or whether it is necessary for the Court to set this matter for further scheduling to resolve any remaining issues.

---

[17]For example, in its counterclaim, Cruickshank seeks a declaration that determines "what, if any, claims certain third parties may have against the policy." Doc. 28 at 5. It is not clear whether the contours of this broad claim are fully addressed above.

**DONE AND ORDERED** at Jacksonville, Florida this 27th day of March, 2009.

TIMOTHY J. CORRIGAN
United States District Judge

s.
Copies:

counsel of record
Terrence M. White, Esq. (Mediator)